845 So.2d 498 (2003)
Modester THOMAS and Matthew Thomas
v.
FINA OIL AND CHEMICAL COMPANY et al.
No. 2002 CA 0338.
Court of Appeal of Louisiana, First Circuit.
February 14, 2003.
*499 Chad F. Reynolds, Earl Reynolds, Baton Rouge, for Plaintiffs-Appellants Modester Thomas and Matthew Thomas.
Murphy J. Foster, III, Juliet T. Rizzo, Cade A. Evans, Baton Rouge, for Defendants-Appellees Fina Oil and Chemical Company and Larry Braud.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
PETTIGREW, J.
In this case, plaintiffs challenge the trial court's judgment granting summary judgment *500 in favor of defendants. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY
For at least the last 25 years, Modester Thomas has suffered from a skin condition called "atopic dermatitis," an inherited skin disease that requires daily treatment with ointments and creams. This treatment varies depending on the severity of the skin problems related to the occasional flare-ups that she encounters, flare-ups that last anywhere from 30 to 60 days. According to Ms. Thomas, this condition will be with her the rest of her life.
Ms. Thomas began working for Fina Oil and Chemical Company ("Fina") in approximately 1989 and continues to work for Fina at this time. Ms. Thomas is employed as a laboratory technician in Fina's Cosmar Styrene Plant, which requires that she maintain several job certifications. To this end, Ms. Thomas must work, on a rotating basis, in the water and waste treatment units. All technicians in Ms. Thomas' position are required to perform the same job duties.
According to the record, Ms. Thomas performed work in the water and waste treatment units from 1989 until 1996 with no major aggravation of her atopic dermatitis while performing her job duties. Although she acknowledged that she did, in fact, have some flare-ups during this time, Ms. Thomas indicated that they were never as bad or as frequent as they later became in mid-1996, when her atopic dermatitis worsened while working in the water and waste treatment units. In response to Ms. Thomas' complaints, her superiors at Fina initiated attempts to determine the cause of the flare-ups and assigned Ms. Thomas to work in the environmental laboratory (the "lab") when necessary.
Ms. Thomas was seen by Dr. Rebecca Giles and Dr. Robert L. Rietschel for this very purpose. Neither Dr. Giles, a medical doctor specializing in dermatology, nor Dr. Rietschel, the chairman of the Department of Dermatology at Ocshner Clinic in New Orleans, was able to definitively link anything from Ms. Thomas' work environment to the aggravation of her atopic dermatitis. As a result, Dr. Giles released Ms. Thomas to return to work with no medical restrictions on April 30, 1998. Ms. Thomas returned to work and resumed her duties in the water and waste treatment units at that time. In June 1999, Ms. Thomas had another severe flare-up and was again assigned to work in the lab. According to the record, Ms. Thomas has remained assigned to the lab and has not worked in either the water or waste treatment units since that time.
On February 11, 2000, plaintiffs, Ms. Thomas and her husband, Matthew Thomas, filed the instant claim for damages against Fina and Ms. Thomas' supervisor, Larry Braud, alleging that an allergen in the water and waste treatment units caused severe skin eruptions. Ms. Thomas further asserted that Fina and Mr. Braud had committed the intentional torts of assault, battery, and intentional infliction of emotional distress by forcing her to work in the water and waste treatment units knowing that an offensive or harmful contact would occur thereby leading to serious health problems. Mr. Thomas also asserted a claim for loss of consortium based on "a marked change in his and his wife's capacity and lifestyle since the intentional acts by Defendants."
Defendants filed an answer generally denying the allegations of the petition and stating that "the provisions of the Louisiana Workers' Compensation Act [the "Act"], La. R.S. 23:1021 et seq. serve as the exclusive remedy to Plaintiffs and bar all *501 of Plaintiffs' claims against Defendants." Thereafter, defendants filed a motion for summary judgment alleging that there was no genuine issue of material fact and that they were entitled to judgment as a matter of law. Noting that the Act was the exclusive remedy for unintentional work-related injuries, defendants asserted, "Plaintiffs have not shown, nor can they show, that [defendants] ever intended to cause them harm or ever knew with substantial certainty that injury would occur." Attached to this motion for summary judgment were the following exhibits: (1) excerpts from plaintiffs' depositions; (2) various letters from Ms. Thomas' treating physicians; and (3) the affidavit of Mr. Braud. In opposition to the motion, plaintiffs submitted (1) excerpts from the depositions of Ms. Thomas and William Taylor, Director of Human Resources at Fina; (2) various letters from Ms. Thomas' treating physicians; (3) the deposition of Warren Hoffman, Production Supervisor at Fina; and (4) the deposition of Mr. Braud.
The trial court heard argument on the motion for summary judgment on August 29, 2001. After considering the law and evidence in the record, the court granted the motion for summary judgment, dismissing, with prejudice, plaintiffs' action. A judgment in accordance with the court's findings was signed on September 13, 2001. On October 12, 2001, the trial court issued reasons for its ruling, wherein the court adopted, as its own, the memorandum in support of the motion for summary judgment previously filed by defendants. It is from this judgment that plaintiffs have appealed, assigning the following specifications of error:[1]
1. The trial court erred in concluding that Modester Thomas' skin eruptions were a Work-Place Injury with her exclusive remedy of the [Act].
2. The trial court erred in concluding that Modester Thomas did not prove that she was the subject of an intentional act and that harm was substantially certain to follow.
3. The trial court erred in concluding that it was necessary for Modester Thomas' doctors to relate her skin "Flare-ups" with her employment at Fina.
4. The trial court erred in finding that Larry Braud did not commit the intentional tort of Battery and Assault against Modester Thomas, such that the Plaintiffs' claims against Larry Braud are also subject to the [Act].
5. The trial court erred in finding that Plaintiffs' [sic] have not suffered Intentional Infliction of Emotional Distress.
Thus, the central issue to be decided by this court is whether Fina and/or Mr. Braud committed an intentional tort such that plaintiffs' claims would not be barred by the exclusivity of the Act.

SUMMARY JUDGMENT
A motion for summary judgment is a procedural device used to avoid a fullscale trial when there is no genuine factual dispute. Sanders v. Ashland Oil, Inc., 96-1751, p. 5 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1034, writ denied, 97-1911 (La.10/31/97), 703 So.2d 29. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La.Code Civ. P. art. 966(B). Summary *502 judgment is favored and is designed to secure the just, speedy, and inexpensive determination of every action. La. Code Civ. P. art. 966(A)(2).
The initial burden is on the mover to show that no genuine issue of material fact exists. If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense, then the nonmoving party must produce factual support sufficient to satisfy his evidentiary burden at trial. La.Code Civ. P. art. 966(C)(2). If the nonmoving party fails to do so, there is no genuine issue of material fact, and summary judgment should be granted. La.Code Civ. P. arts. 966 and 967; Simmons v. Berry, 98-0660, p. 4 (La.App. 1 Cir. 12/22/00), 779 So.2d 910, 914.
In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. J. Ray McDermott, Inc. v. Morrison, 96-2337, p. 9 (La.App. 1 Cir. 11/7/97), 705 So.2d 195, 202, writs denied, 97-3055, 97-3062 (La.2/13/98), 709 So.2d 753, 754. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this case. Foreman v. Danos and Curole Marine Contractors, Inc., 97-2038, p. 7 (La.App. 1 Cir. 9/25/98), 722 So.2d 1, 4, writ denied, 98-2703 (La.12/18/98), 734 So.2d 637.

INTENTIONAL ACT
The question of whether an employer's conduct falls under the intentional act exception to the Act was considered recently by the Louisiana Supreme Court in Reeves v. Structural Preservation Systems, 98-1795 (La.3/12/99), 731 So.2d 208. In that case, the employer directed an employee to move a sandblasting pot manually, a procedure that was prohibited by Occupational Safety and Health Administration (OSHA) and that the employee's supervisor feared would eventually lead to injury. The court held that the conduct complained of did not amount to an intentional act and that plaintiff's remedy was limited to workers' compensation benefits.
In Reeves, the court outlined the history of workers' compensation in Louisiana. From 1914 until 1976, employees were free to pursue tort remedies for work-related injuries against executive officers and coemployees. In 1976, the legislature amended the Act in two important respects. It provided that workers' compensation shall be the exclusive remedy against not only the employer, but also against any principal, officer, director, stockholder, partner or employee of the employer, or principal who was engaged at the time of the injury in the normal course and scope of his employment. La. R.S. 23:1032(A)(1)(a). It also provided that the employee is not limited to workers' compensation and may pursue any other remedy where his compensable injury results from an intentional act. La. R.S. 23:1032(B); Reeves, 98-1795 at 3, 731 So.2d at 210. As amended in 1976, La. R.S. 23:1032(B) reads: "Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner, or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act."
As the Reeves court noted, the legislature, in considering the 1976 amendment, used the words "intentional act" and rejected the following terminology offered for inclusion in the proposed legislation: "violation of a recognized safety rule or *503 regulation, ... failure to provide a safety device required by a recognized safety rule or regulation or by a statute, or by gross negligence on the part of a supervisory employee" and "gross negligence" (meaning "such disregard of the interest of others that the tortfeasor's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonable careful man under like circumstances"). Reeves, 98-1795 at 4, 731 So.2d at 210. The court explained that the meaning of "intent" in the context of the amended statute was that the employer or other person identified in the Act must either (1) consciously desire the physical result of his act, whatever the likelihood of the result happening from his conduct, or (2) know that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Reeves, 98-1795 at 6, 731 So.2d at 211.
Citing Bazley v. Tortorich, 397 So.2d 475, 480 (La.1981) and a long list of subsequent cases, the Louisiana Supreme Court noted that it and the appellate courts have narrowly construed the intentional act exception according to the legislative intent. Reeves, 98-1795 at 6-8, 731 So.2d at 211-212. Likewise, in Reeves, the court narrowly construed the intentional act exception. Although OSHA guidelines prohibited the sandblasting pot from being moved manually and although the supervisor had requested a forklift, the fact that he nevertheless ordered the pot moved manually did not establish an intentional act. Reeves, 98-1795 at 8, 731 So.2d at 212.
We note that "substantial certainty" requires more than a reasonable probability that an injury will occur. "Certainty" has been analogized to "inevitability" or "incapable of failing." A high probability of someone getting hurt is not enough. The exception is designed for acts that are intentional, not for acts that are wanton or reckless or grossly negligent. Reeves, 98-1795 at 9-10, 731 So.2d at 212-213. Moreover, the violation of safety standards, without more, is generally not sufficient. Reeves, 98-1795 at 7, 731 So.2d at 211; See also Williams v. Gervais F. Favrot Co., Inc., 573 So.2d 533, 541 (La.App. 4 Cir.), writ denied, 576 So.2d 49 (La.1991).
A distinguishing feature in determining whether the conduct complained of meets the "substantial certainty" test is whether the event has occurred before or whether the injury has previously manifested itself. In Reeves, the eventmoving the pot manuallyhad occurred before, without injury. Therefore, the injury was not substantially certain to result from again moving the pot manually. Reeves, 98-1795 at 10, 731 So.2d at 213.
Based on the above cited cases and the legislative purpose behind the enactment of the intentional act exception, the question before us in the instant case is whether, based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, defendants proved that they lacked the requisite intent for a tort action and that there were no unresolved issues of material fact as to whether defendants were substantially certain that the injury would result from their actions. Our de novo review of the facts of this case compels us to conclude that defendants carried their burden of proof. Thus, the burden shifted to plaintiffs to come forward with evidence that defendants knew that an aggravation of Ms. Thomas' skin condition was substantially certain to occur when she was assigned to work in the water and waste treatment areas of the plant. Plaintiffs failed to produce any such evidence.
When Ms. Thomas initially complained about the flare-ups of her atopic dermatitis *504 and asserted that it was aggravated by her work environment, Fina sent her to see Dr. Giles, who in turn referred her to Dr. Rietschel. In a letter dated April 28, 1997, Dr. Giles notified Fina that Ms. Thomas had been examined by her as well as by Dr. Rietschel and that neither was able to conclude that anything in the work environment caused Ms. Thomas' flare-ups. Dr. Giles reported that Ms. Thomas' atopic dermatitis was "very well controlled with topical medications and two courses of oral Prednisone." Ms. Thomas was seen a second time by Dr. Rietschel at the request of Dr. Giles in March 1998. Again, Dr. Rietschel reported that he did extensive testing and was unable to reveal any known allergens to avoid at work, other than paraphenylenediamine, which Dr. Rietschel indicated was a black dye occasionally found in a number of potential sources other than hair dye.[2] Dr. Rietschel also noted that Ms. Thomas reacted to the foam lining of her helmet, a problem that, according to Mr. Braud, was immediately addressed by replacing the lining of the helmet so as not to aggravate Ms. Thomas' skin condition. On April 30, 1998, Ms. Thomas was ultimately released by Dr. Giles to return to her work environment with no medical restrictions. Dr. Giles noted that she was unable to conclude what caused the flare-ups in Ms. Thomas' skin condition.
In her deposition, Ms. Thomas testified that she worked in the water and waste treatment units from 1989 until 1996 with no major aggravation of her atopic dermatitis while performing her job duties. Moreover, she acknowledged that her doctors were unable to pinpoint exactly what was causing her flare-ups or that these flare-ups were at all work-related. Thus, it follows that if the doctors have been unable to attribute Ms. Thomas' skin condition to her work environment, then defendants cannot be deemed to have known, with substantial certainty, that assigning Ms. Thomas to work in the water and waste treatment units would result in any harm to her.
According to the depositions of Ms. Thomas' supervisors, Warren Hoffman and Larry Braud, neither of them had any information, other than the assertions by Ms. Thomas, that the aggravation of Ms. Thomas' skin condition was related to her work in the water and waste treatment units of the plant. Mr. Braud testified that he scheduled Ms. Thomas' work assignments in the same manner that he handled assignments of all other laboratory technicians. Noting that he knew of no medical restrictions with regard to Ms. Thomas, Mr. Braud indicated that he had no reason not to assign her to work in the water and waste treatment units as is required for her to maintain her certifications. Mr. Braud added that after Ms. Thomas' flare-up in June 1999, she was moved to the lab where she continued to work for the remainder of the year. He testified that there was no reason to move Ms. Thomas back into the water and waste treatment units because she had already satisfied her certification requirements for the year. However, with the start of a new year in 2000, it was necessary for Ms. Thomas to again work in the water and waste treatment units to maintain her certifications. It was this decision that prompted a February 9, 2000 letter from Ms. Thomas to Mr. Hoffman wherein she inquired about this decision and requested that she "not be placed back in these areas as they do cause [her] to have skin eruptions *505 or other medical problems." In a response dated February 15, 2000, Ms. Thomas was advised that pending an additional review of her medical records, she would "remain in [her] lab assignments and will not be required to work the water treating and waste treating areas." According to the record, Ms. Thomas has not worked in these areas of the plant since June 1999.
Plaintiffs argue on appeal that defendants had the requisite knowledge because Ms. Thomas' supervisors twice saw her aggravated skin condition while she was working in the water and waste treatment units. Thus, plaintiffs claim that defendants should have known that Ms. Thomas only had these flare-ups when she was working in the water and waste treatment units. We do not agree. Not only does the medical evidence fail to support this assertion, but also the testimony of Mr. Hoffman and Mr. Braud was such that they rarely saw Ms. Thomas when she was working in other areas of the plant, namely the lab. Therefore, they would have no knowledge of whether she had suffered an aggravation of her skin condition while in that part of the plant. Mr. Braud testified that when Ms. Thomas works in the lab, she is under different supervision and he may go three weeks or longer without an opportunity to see her. When asked if he had seen Ms. Thomas since her assignment to the lab in June 1999, Mr. Braud indicated that he had and noted as follows: "The time I observed her, I would say she was near normal. I've seen her, like I said, some days a little worse than others." Mr. Hoffman indicated that he had very little contact with Ms. Thomas while she was working in the lab and that if she were to have a flare-up while working there, he probably would not have even known about it, unless she would have called him and reported it to him.
Plaintiffs also claim that defendants "by their actions had knowledge that Modester Thomas would have a `flare-up' and have skin eruptions, due to the fact when she would have a `flare-up,' [they] would reassign her to work in the environmental lab." This argument fails as well. Both Mr. Hoffman and Mr. Braud testified that when Ms. Thomas was assigned to work in the lab, the decision was based solely on safety concerns and had nothing at all to do with what might be the cause of the flare-ups. Mr. Braud indicated that working in the water and waste treatment units of the plant was much more physically demanding than working in the lab, where "very little, if any, physical activity" is involved. Technicians assigned to work in the water and waste treatment units were required to do a lot of climbing. Mr. Hoffman testified that on two separate occasions, Ms. Thomas reported to him while working in the water and waste treatment units and complained of vision problems associated with one of her flareups. He noticed that her eyes were swollen and she had a skin rash. On those occasions, Mr. Hoffman was concerned that Ms. Thomas was a safety risk to herself and to others. He reported his concerns to Mr. Braud and requested that Ms. Thomas be moved to the lab.
According to the record, even Ms. Thomas herself was apparently uncertain that her flare-ups were related to her work environment. Both Mr. Hoffman and Mr. Braud testified about an incident in early 1999 when Ms. Thomas requested that she be included in the "turnaround" schedule for overtime in the water and waste treatment units. When asked if he ever told Ms. Thomas that she could not work overtime in the water and waste treatment units, Mr. Hoffman responded as follows: "I told her she couldn'tthat she wasn't eligible for overtime as long as she wasn't able to work in the waste treatment or *506 water treatment unit on her regular scheduled shift." Similarly, Mr. Braud recalled that Ms. Thomas requested to be scheduled for overtime. Mr. Braud noted, "she was telling us it was okay for her to work outside for time and a half but not straight time, and I told her no." Mr. Braud testified further about this incident:
What I can recall, she did request through Warren Hoffman. She asked she questioned why she was not included in the posted turnaround, upcoming turnaround schedule.... She was excluded. She questioned Warren why. She wanted to be included. She wanted the opportunity to work the overtime. My reply to Warren was the only areas she can work overtime in is the environmental lab, which there wasn't any need for the turnaround coverage to reach the lab ... and by her own request not to be workednot to work water treating and waste treating, I said if she don't [sic] want to work it on regular time, she will not work it on overtime.
Following our review of the record in this case, we conclude that none of the testimony presented herein can be interpreted to mean that either Fina or Mr. Braud ever intended to cause Ms. Thomas harm or were substantially certain that harm to Ms. Thomas would inevitably follow their actions of assigning her to work in the water and waste treatment units. While we sympathize with Ms. Thomas' situation, none of defendants' actions meet our jurisprudential parameters of an intentional tort. There is simply no evidence in the record that the flare-ups of Ms. Thomas' skin condition were substantially certain to occur if she worked in the water and waste treatment units. Without such evidence, defendants cannot be held liable for an intentional tort. Thus, Ms. Thomas' claims in tort for assault, battery, and intentional infliction of emotional distress are barred by the Louisiana Workers' Compensation Act. Summary judgment is warranted.

CONCLUSION
For the above and foregoing reasons, we affirm the judgment of the trial court granting summary judgment in favor of defendants and dismissing, with prejudice, plaintiffs' claims. All costs associated with this appeal are assessed against plaintiffs-appellants, Modester Thomas and Matthew Thomas.
AFFIRMED.
NOTES
[1] Although not addressed individually, all issues raised by plaintiffs on appeal will be covered in this opinion.
[2] It is noteworthy that according to the record, Ms. Thomas does not dye her hair. Moreover, according to Mr. Braud's affidavit, Fina does not use the chemical paraphenylenediamine in any of the work areas of the plant.