ATLAS TUBULAR, L.P.
v.
FLASH GAS & OIL SOUTHWEST, INC.
No. 2008 CA 2055.
Court of Appeal of Louisiana, First Circuit.
September 4, 2009.
Not Designated for Publication
JOHN P. WOLFF, III, COLLIN J. LEBLANC, Attorneys for Plaintiff-Appellee Atlas Tubular, L.P.
SHANNAN S. RIEGER, G. WILLIAM JARMAN, PAMELA R. MASCARI, WILLIAM V. COURTNEY, STEPHEN C. HANEMANN, Attorneys for Defendant and Plaintiff in Reconvention-Appellant Flash Gas & Oil Southwest, Inc.
TIMOTHY G. SCHAFER, Attorney for Defendant-Appellee D&D Pipe & Rentals, Inc.
EDWIN G. PREIS, Jr., ROBERT M. KALLAM, WILLARD P. SCHIEFFLER, Attorneys for Defendant-Appellee Lexington Insurance Company
ARMAND J. BRINKHAUS, Attorney for Defendant-Appellee Tube-Tech Services, Inc.
Before: PETTIGREW, MCDONALD, and HUGHES, JJ.
PETTIGREW, J.
In this case, defendant drilling company, in its capacity as plaintiff in reconvention, challenges the trial court's grant of summary judgment dismissing its reconventional demand against plaintiff, a supplier of well tubing. For the reasons that follow, we reverse and remand for further proceedings.

FACTS AND PROCEDURAL HISTORY
In November 2002, a representative of Flash Gas & Oil Southwest, Inc. ("Flash"), a Louisiana corporation, contacted Atlas Tubular, L.P. ("Atlas"), a Texas limited partnership, to inquire whether Atlas could supply Flash with 142 joints of "white band" 2-3/8" RY 95, 5.95 #PH6 tubing to be used in recompletion of a well in the oil field. Tubing of the type and quality specified by Flash is designed specifically for use in high temperature, high pressure wells with corrosive well and wellbore fluids. It was known and reasonably foreseeable to Atlas, as a vendor of this type of tubing, how Flash intended to use the tubing and that the intended use necessitated said tubing be pressure tested, API drifted, inspected, and cleaned. Atlas advised Flash that it had tubing meeting its specifications in stock, and quoted Flash a price for the tubing.
When Flash called back several days later to place its order for the tubing, Atlas advised that the tubing had been sold, but offered to locate the tubing necessary to fulfill Flash's order from another supplier. Atlas contacted D&D Pipe & Rentals, Inc. ("D&D"), and upon learning D&D could supply it with the tubing specified by Flash, Atlas contracted with D&D to purchase 4,450 feet of the requisite tubing.
To prevent Flash from purchasing tubing directly from D&D in the future. Atlas directed D&D to "blindly" ship the tubing directly to Flash. Atlas never disclosed to Flash that the tubing it was purchasing would be supplied by D&D, and at all times pertinent to this litigation. Atlas represented to Flash that it, rather than D&D, was the seller of the tubing. As no one at Atlas would see the tubing it ordered for Flash, Atlas contacted Tube-Tech Services, Inc. ("Tube-Tech") to perform a third-party inspection regarding the condition of the subject tubing.
When Wayne Tate of Tube-Tech arrived at the D&D yard to perform its visual or "spot check" of the inspection for Atlas, Mr. Tate was advised that the tubing had already been inspected and was in the process of being loaded for shipment. As a result, Tube-Tech was unable to perform its inspection or even confirm that D&D had inspected the tubing. Upon apprising Danny Rizzo at Atlas of this development, Mr. Rizzo instructed Mr. Tate not to do anything further.
The tubing was delivered to the Flash well site in early November 2002, and immediately installed from the wellhead down to the first 4,150 feet of the wellbore. After installing 4,150 feet of the tubing within the wellbore, Flash attempted to perforate a zone at 16,687 feet; however the perforating gun became inexplicably lodged at approximately 2,800 feet. After considerable effort, the gun was dislodged and returned to the surface. An inspection of the perforating gun showed it was covered with rust scale particles of considerable size.
Concerned that the tubing may not have been of the quality it specified, Flash immediately notified Atlas by both phone and electronic mail that its gun had become lodged at 2,800 feet and of the presence of rust scale on the gun. Flash sought confirmation that the tubing had in fact been cleaned, drifted, and tested prior to its delivery. After attempting to remove and/or clean the rust scale from the tubing, Flash once again attempted to send the perforating gun through the tubing. Again the gun became lodged; however, due to the extreme depth, Flash was unable to retrieve it.
Ultimately, Flash was forced to remove and replace all 16,500-plus feet of the production tubing in the well. Flash asserts that it incurred substantial expense, including but not limited to the loss of its well, due to the fact that the tubing supplied by Atlas had not been adequately tested, drifted, cleaned, and inspected. As a result, Flash never paid Atlas for the subject tubing.

ACTION OF THE TRIAL COURT
On January 16, 2003, Atlas instituted this litigation against Flash seeking to recover the sum of $17,800.63 representing freight, sales tax, and the price of the tubing that Atlas sold to Flash on open account in 2002. Atlas alleged that despite written demand for payment, Flash made no payments upon this open account. Accordingly, Atlas sought recovery of the amount owed, interest, and reasonable attorney fees.
Flash filed an answer and reconventional demand against Atlas on March 17, 2003, asserting the tubing sold to it by Atlas did not meet the specifications agreed upon and was also defective in that it had not been cleaned, drifted, or tested. Flash alleged that due to the inferior quality of the tubing provided by Atlas, Flash incurred substantial damages; and reconvened against Atlas pursuant to several legal theories, namely, breach of contract, redhibition, and negligence. On May 16, 2003, Atlas responded by filing an answer to Flash's reconventional demand, in addition to filing third party demands against D&D and Tube-Tech.
On December 26, 2007, Atlas filed a motion for summary judgment seeking a dismissal of the claims asserted against it by Flash. Atlas contended that pursuant to Louisiana law, as a non-manufacturer seller, it was not liable for damages caused by a defective item absent notice of the defect. Atlas further argued that even assuming Atlas was liable for the condition of the tubing, which it denied, Flash was precluded from recovery as it used the tubing despite the noticed defect without affording Atlas an opportunity to repair it. Following a hearing on May 12, 2008, the trial court granted Atlas' motion for summary judgment and dismissed all claims put forth against it by Flash. From this judgment, Flash has appealed.

ERRORS ASSIGNED ON APPEAL
In connection with its appeal in this matter, Flash has assigned what it claims are errors committed by the trial court:
1. The trial court erred in granting summary judgment and dismissing Flash's claim for breach of obligations imposed on Atlas pursuant to La. Civ. Code art. 2524;
2. The trial court erred in granting summary judgment and dismissing Flash's claim for breach of obligations imposed on Atlas pursuant to La. Civ. Code art. 2529;
3. The trial court erred in granting summary judgment and dismissing Flash's claim against Atlas for redhibition pursuant to La. Civ. Code art. 2520; and
4. The trial court erred in granting summary judgment and dismissing Flash's claim against Atlas for negligence despite the existence of issues of material fact with respect to that claim.

STANDARD OF REVIEW
A motion for summary judgment is a procedural device used to avoid a full scale trial when there is no genuine issue of material fact. Johnson v. Evan Hall Sugar Coop, Inc., 2001-2956, p. 3 (La. App. 1 Cir. 12/30/02), 836 So.2d 484, 486. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La. Code Civ. P. art. 966(B). Summary judgment is favored and is designed to secure the just, speedy, and inexpensive determination of every action. La. Code Civ. P. art. 966(A)(2); Thomas v. Fina Oil and Chemical Co., XXXX-XXXX, pp. 4-5 (La. App. 1 Cir. 2/14/03), 845 So.2d 498, 501-502.
On a motion for summary judgment, the burden of proof is on the mover. If, however, the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover's burden on the motion does not require that all essential elements of the adverse party's claim, action, or defense be negated. Instead, the mover must point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense. Thereafter, the adverse party must produce factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the adverse party fails to meet this burden, there is no genuine issue of material fact, and the mover is entitled to summary judgment. La. Code Civ. P. art. 966(C)(2); Robles v. Exxonmobile, XXXX-XXXX, p. 4 (La. App. 1 Cir. 3/28/03), 844 So.2d 339, 341.
In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Allen v. State ex rel. Ernest N. Morial New Orleans Exhibition Hall Authority, XXXX-XXXX, p. 5 (La. 4/9/03), 842 So.2d 373, 377. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this case. Foreman v. Danos and Curole Marine Contractors, Inc., 97-2038, p. 7 (La. App. 1 Cir. 9/25/98), 722 So.2d 1, 4, writ denied, 98-2703 (La. 12/18/98), 734 So.2d 637.

DISCUSSION
In support of its motion for summary judgment, Atlas introduced excerpts from depositions given by John Hubbard, Jason Hubbard, and Danny Rizzo of Atlas, and Harvey Kelley of Flash, together with an invoice from D&D Pipe Rentals, and a copy of an electronic mail transmission (" e-mail") from Harvey Kelley of Flash to Jason Hubbard of Atlas.
In the excerpt from his deposition, John Hubbard of Atlas testified he received the initial inquiry from Harvey Kelley of Flash and recalled he referred the matter to either his son Jason Hubbard or Danny Rizzo.
In an excerpt from his deposition, Jason Hubbard confirmed he spoke with Harvey Kelley of Flash at the request of his father, John Hubbard, and quoted Mr. Kelly the price for the specified tubing that Atlas had in stock. When Mr. Kelley called back several days later to place an order for the quoted tubing, Jason advised that the tubing had been sold, but offered to locate other tubing that would satisfy Mr. Kelley's requirements.
In another excerpt, Jason testified it was standard practice in the industry to ship items "blind," as "I'm not going to tell your end user, being Flash in this case,. . . hey, I bought the pipe from XYZ because if that would be the case, you lose a customer."
Atlas employee Danny Rizzo testified in an excerpt from his deposition that he had no personal knowledge as to the kind of pipe D&D shipped to Flash. Mr. Rizzo claimed he only knew that Wayne Tate of Tube-Tech advised him the tubing "looked good." Mr. Rizzo stated he "was fine with that." Mr. Rizzo also confirmed it was his handwriting on a document that gave shipping and delivery instructions to the Flash well. Mr. Rizzo further explained that "blind" meant he wanted the tubing "to be shipped with the bill of lading without D&D's letterhead." Mr. Rizzo stated he "just didn't want the customer to know where [the tubing] was bought."
The invoice from D&D to Atlas reflected a sale on 11/05/2002 of "2 3/8", 5.95#, RY-95, PH-6, 4,450' @$2.75 PER FT." for the price of $12,237.50. It was further noted "THIS MATERIAL WILL HAVE AND [sic] O TO 12 1/2 EMI INSPECTION. HYDRO TESTED TO 10,000 AND FULL LENGTH DRIFT. [Underscoring supplied.]"[1]
Although counsel for Atlas would later argue at the hearing on the motion for summary judgment that "Flash never contacted Atlas after they [Flash] got their tubing," the e-mail dated 11/12/02 from Harvey Kelley of Flash to Jason Hubbard of Atlas proves otherwise. The e-mail read as follows:
Jason,
We ran 4150' of the tubing we purchased from the surface to 4150'. 3 joints leaked and several would not drift with a 1.773" rabbit. I was not on location when they were running the pipe last week. After discussing with our consultant what went on while running the pipe, I found out that when they picked the pipe up in the derrick, they were experiencing finding scale in the thread protectors when they removed them. They would then lightly hammer the pipe and get more scale out. We ran a 20' 1-38" Owens Swing Jet perforating gun in the well this morning (Nov. 12th) and could not get past 2880'. When we pulled out of the well the gun was caked with tubing scale. We checked all of our pump lines and the eline lubricator and there is no scale in those lines. They only thing [sic] we had pumped was bay water to fill up the lubricator and test. We are 99% sure the scale is from the tubing we ran in the well.
I did receive the inspection document. Please advise as to how much scale Mr. Hoffpauir saw when they inspected and air rattled the pipe and also what size drift they used? And please advise on any suggestions.
Thanks, Harvey
Counsel for Atlas also argued to the trial court the foregoing e-mail from Flash constitutes an admission against interest. Atlas contended a defect claim would not be available pursuant to La. Civ. Code art. 2521[2] if the purchaser knew or should have known of the defect at the time of the sale.[3] Counsel for Atlas summarized the foregoing e-mail from Flash to Atlas as, "Here you have their own guy out there saying, `We've got so much rust I've got to call and tell me what do you want me to do." Counsel for Atlas concluded by claiming Flash had made so many admissions regarding the "unusual volume of rust in the tubing that at that point the legal standard is they either knew or should've known and it's on their head if they go forward and use it." Lastly, counsel for Atlas stated Flash was required to give Atlas an opportunity to repair the thing sold and this was not done.
As part of its memorandum in opposition to Atlas' motion for summary judgment, Flash introduced excerpts from depositions given by Atlas employee Danny Rizzo, Harvey Kelley of Flash, Wallace Granger and Wayne Tate of Tube-Tech, John Hubbard, Richard Bryant, W.H. Henkel, III, and Jason Hubbard of Atlas, together with a copy of Atlas' answers and responses to discovery requests propounded by Flash, and the notarized affidavit of Edward R. Ziegler, Professional Engineer and Certified Safety Professional.
In the excerpt from his deposition introduced by Flash, Atlas employee Danny Rizzo testified that he expected Dean Angelle of D&D to test, drift, inspect, and clean the tubing.[4] Mr. Rizzo stated that all he wanted from Wallace Granger of Tube-Tech was simply "another set of eyes." Mr. Rizzo stated he "wanted him to look at [the tubing] and make sure it was done and that it looked good when it left."
In the excerpt from his deposition introduced by Flash, Harvey Kelly confirmed that Atlas never disclosed to him the tubing he purchased for Flash was coming from D&D.
In an excerpt from his deposition introduced by Flash, Wallace Granger of Tube-Tech recalled he was contacted by Danny Rizzo of Atlas to do a "spot check" or "visual inspection" of some tubing Atlas was purchasing from D&D. Mr. Granger stated he sent Wayne Tate to D&D, who contacted him, after arriving at D&D, to advise him that an inspection could not be performed as the tubing was being readied for loading. At this point, Mr. Granger advised Mr. Tate to relay this development to Mr. Rizzo at Atlas. Mr. Granger testified Mr. Tate called him back later and advised that Mr. Rizzo did not want to do anything further. Mr. Granger further testified he personally called Mr. Rizzo to advise that Tube-Tech could send a crew "right quick" to reinspect the tubing, but was advised Atlas did not want to spend the money. As Tube-Tech had been unable to inspect the tubing, Mr. Granger advised Mr. Rizzo that there would be no charge.
In an excerpt from his deposition introduced by Flash, Tube-Tech employee Wayne Tate recalled that upon his arrival at D&D, he spoke to Ron Meaux who advised he had just finished running the tubing purchased by Atlas through the EMI unit. Mr. Tate stated he did not examine the tubing, but called Danny Rizzo at Atlas to inquire whether Atlas wanted him to oversee the loading of the tubing. After being advised as to what Tube-Tech would charge, Mr. Rizzo purportedly replied "Well, don't worry about it." Mr. Tate testified that Tube-Tech's charge was $100.00 per hour with a $1,200.00 per day minimum, but added that when performing third-party inspections, Tube-Tech is ordinarily present at the beginning of the job rather than the end.
In another excerpt from his deposition, Mr. Tate testified that during the approximately thirty minutes he spent at D&D, he recalled noticing the tubing in question stacked about 15-20 feet away, but he did not examine it on his way to speak to Mr. Meaux.
Mr. Tate, in another excerpt from his deposition, stated he did not know whether there were thread protectors on the tubing, nor did he look inside for scale inside the tubing. Mr. Tate further stated that he and Mr. Rizzo spoke only about the loading of the tubing, and he advised Mr. Rizzo that the tubing had been EMI tested. Mr. Tate denied ever telling Mr. Rizzo "You got a good clean string of pipe" or providing any opinion to Mr. Rizzo regarding the condition of the tubing. Mr. Tate admitted he had no knowledge as to whether the tubing in question had been inspected.
In another excerpt from his deposition introduced by Flash, John Hubbard of Atlas testified that during his initial conversation with Harvey Kelly of Flash, he felt certain Mr. Kelly advised him the tubing was needed to recomplete a well, but couldn't recall the exact wordage.
In another excerpt from his deposition, Atlas employee Danny Rizzo testified that Jason Hubbard of Atlas asked for assistance in finding some tubing for Flash. Mr. Rizzo stated that, as the well was in Louisiana, he called D&D as, logistically, they were in a good position. Mr. Rizzo recalled he spoke with either Dean Angelle or Wayne Tate, but could not recall which. Mr. Rizzo stated he told D&D he needed tubing measuring 2-3/8ths, 595, RY 95 PH 6 or something like it, and that he needed a test, a drift, and an inspection.
Mr. Rizzo further testified in another excerpt that he did not recall Jason Hubbard specifying a specific grade of tubing  "the weight was the primary thing and the end finish." When questioned as to the difference between N-rated tubing and RY-rated tubing, Mr. Rizzo stated "[o]ne is 80,000 yield and one is 95,000 yield." Mr. Rizzo agreed he expected the tubing Atlas sold to Flash to be clean on both the inside and outside when it arrived, and added this was standard in the industry. Mr. Rizzo explained it was important for cosmetic reasons for the tubing to be clean on the outside and important for the tubing to be clean on the inside so that tools and equipment could pass through it. Mr. Rizzo further stated "[i]f [the tubing] was drifted, it had to have been cleaned or the drift would not pass through it."
In an excerpt from his deposition introduced by Flash, Richard J. Bryant testified he had been working in the oil field in various capacities for 47 years. In another excerpt from his deposition, Mr. Bryant testified that "[a]ny pipe you are going to get is going to have a little rust. . . . you can't take care of pipe nowadays like you used to could [sic] when they could spray it. .. and coat it [due to environmental regulations]." Mr. Bryant declined to say how tubing can be stored after it has been cleaned. Mr. Bryant added "if you are going to get pipe out on the job, and it's been [checked] within a month, I think it ought to be checked." Mr. Bryant added "I think it should be checked to make sure, you know, because under certain conditions ... if it's been pulled out of a well, it's got salt water in it and something and it's not washed out or cleaned out sufficiently, it can cause rust." According to Mr. Bryant, "a month might be too long, or two weeks might be too long. ... You know, it all depends."
Mr. Bryant stated Harvey Kelly of Flash told him the tubing had been drifted, cleaned, and inspected. When the tubing arrived, Mr. Bryant related that he directed a man to check the threads, which looked good. Mr. Bryant testified he also tapped the tubing with a ballpeen hammer to "make sure we didn't have no [sic] lot of rust fall out it. A little would fall out and come out. In your [thread] protectors you would have some." When questioned as to whether he expected to see rust, Mr. Bryant replied, "you are not going to get pipe hardly that you are not going to have a little fine but no big stuff fall out of there, but fine, little fine dust ain't gonna hurt you." With regard to the tubing in question, Mr. Bryant stated he saw "[m]ostly powder and you had little flakes .... [b]ut I run pipe like this before, you know, with little powder and whatever." Mr. Bryant further stated it was not until "[a]fter we run [the tubing into the well] and all, that's when we started having problems."
In an excerpt from his deposition introduced by Flash, William H. Henkel testified during the installation of the tubing, he saw "light rust. Very light surface rust. . . . That came from the interior of the pipe.... Sitting on the drill deck."
In another excerpt from his deposition, Harvey Kelley of Flash testified that "[v]isually the pipe looked okay." Mr. Kelley further testified that upon removing the thread protectors on the ends of the lengths of tubing, he noticed "little pieces of rust scale." Upon calling Atlas, Mr. Kelley testified he "was told and reassured by Atlas the pipe had been cleaned, drifted and tested." Mr. Kelley was unable to recall whether he called Atlas after the tubing was run or during the actual running, but stated emphatically "I do know I made that call before we ever discovered we had a real problem with rust scale."
In opposition to Atlas' motion for summary judgment, Flash introduced the notarized affidavit of Edward R. Ziegler, Professional Engineer and Certified Safety Professional. Mr. Ziegler attested to the fact he is a registered professional engineer with thirty-five years experience in the oil and gas industry with specialties in the areas of well production, work over, and recompletion, and currently serves as the American Society of Safety Engineers representative on the ANSI Z49 Cutting and Welding Safety Committee.
Based upon his personal knowledge, education, training, work experience, and review of depositions and evidence related to this case, Mr. Ziegler, in part, opined:
11. The industry practice and standard is for oilfield tubulars to be inspected and checked for internal condition before the oilfield tubulars arrive at the well location. ...
12. Based on the opinion in the paragraph above, persons at the wellsite typically and reasonably rely on the oilfield tubulars to be in good and proper condition when they arrive at the wellsite, so factors such as some rust, dust, or flaking, if observed at the wellsite, can be considered to be "normal" and not as indication of problems or defects that need more investigation, and certainly do not result in knowledge by the oil and gas company of any defect at that point in the well and tubular use sequence.
Finally, Flash introduced another excerpt from the deposition of Jason Hubbard of Atlas who confirmed the fact that Harvey Kelley of Flash telephoned Atlas several times regarding the presence of rust scale in the tubing it purchased from Atlas. Jason Hubbard agreed that once he referred the tubing order from Flash to Danny Rizzo, he did nothing further until Mr. Kelley of Flash reported scale problems. Thereafter, Jason Hubbard said, he received several e-mails from Mr. Kelley regarding scale problems in the tubing, but "nothing that was out of the ordinary." Jason Hubbard stated he did nothing further and again handed the matter to Danny Rizzo, who spoke briefly with D&D.
Atlas subsequently filed a reply memorandum in support of its motion for summary judgment and further attached excerpts from various depositions including Steven Haller, Richard J. Bryant, and Edward Ziegler.
In an excerpt from his deposition introduced by Atlas, Flash employee Steven Haller was questioned as to his opinion on the amount of rust and scale necessary to have jammed the perforating gun. Mr. Haller replied that it probably would not take much, possibly a flake or two, to jam the perforating gun.
In an excerpt from his deposition introduced by Atlas, Flash employee Richard J. Bryant testified he had seen some rust chips in the tubing, but only when they ran the tubing into the well did Flash experience problems.
In an excerpt from his deposition introduced by Atlas, Edward Ziegler agreed that if a defect, such as a dent, is visually observed in a length of tubing, that tubing should not be used.
At the hearing on Atlas' motion for summary judgment, counsel for Atlas argued that pursuant to La. Civ. Code art. 2545[5], Atlas could not be found liable absent knowledge of a defect in the tubing. Atlas further claimed to be a good-faith seller, who, absent knowledge of a defect in the thing sold that it failed to declare cannot be held liable for damages. Atlas further claimed that it is undisputed that Atlas advised Flash it did not have the tubing on site, and consequently it was coming from a third party. In conclusion, Atlas urged there was sufficient amounts of rust on the tubing to require that Flash contact Atlas before utilizing the tubing in the well.
In response, counsel for Flash sought to dispel some of the alleged inaccuracies put forth in argument by counsel for Atlas. While conceding Flash employees noticed small amounts of rust in the thread protector caps of the tubing at the time of delivery, such an amount was not deemed sufficient to discontinue use of the tubing. Flash disputed Atlas' assertion that Flash found rust sufficient to fill a five-gallon can before it used the tubing. Flash argued that only upon recovering the perforating gun after it became lodged the first time, it discovered substantial amounts of rust on the gun and notified Atlas via e-mail of this development. Flash directed the court's attention to deposition testimony wherein Atlas employees admitted they took no action.
Flash urged that the amount of rust present on the tubing at the time of delivery and whether Flash should have used the tubing constitute questions of material fact that preclude summary judgment.
Flash further argued that pursuant to Boos v. Benson Jeep-Eagle Company, Inc., 98-1424 pp. 7-8 (La. App. 4 Cir. 6/24/98), 717 So.2d 661, 666, 98-2008 (La. 10/30/98), 728 So.2d 387, where a reasonable purchaser would expect that the seller would have made an inspection and would have disclosed any significant defects discovered in the course of such an inspection, a seller cannot avoid responsibility by proving merely that it, in fact, made no such inspection. Flash asserted that it was customary in the industry for tubing suppliers to inspect the product it sells.
Based upon a thorough review of the pleadings and evidence contained in the record, we conclude that there remain disputed issues of material fact with respect to the claims asserted against Atlas by Flash that preclude summary judgment.
Aside from the redhibition questions arising under La. Civ. Code art. 2520[6] relative to the amount of rust present on the tubing at the time of delivery and whether the amount of rust was sufficient to place Flash on notice of a defect in the tubing that would not warrant its use, this court is of the opinion that substantial issues remain with respect to the breach of contract claims put forth by Flash pursuant to La. Civ. Code arts. 2524[7] and 2529.[8] There is no evidence in the record to indicate the tubing sold to Flash by Atlas was of the quality stipulated by Flash, or that D&D fulfilled its obligations to test, inspect, clean, and drift the tubing. Curiously, the record is devoid of any evidence as to the type or extent of any testing allegedly performed by D&D.
The trial court's grant of summary judgment in favor of Atlas and dismissal of all claims put forth against it by Flash is hereby reversed.

CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is hereby reversed and this matter is remanded to the trial court for further proceedings consistent with this opinion. All costs associated with this appeal shall be assessed against plaintiff. Atlas Tubular, L.P.
REVERSED AND REMANDED.
HUGHES, J., concurring.
Whether Atlas specifically represented that the tubing it sold had a certain quality and whether the tubing when delivered to the drill site possessed that quality are issues that would seem to preclude summary judgment in favor of Atlas.
NOTES
[1] Although later referred to as a "certification" in Atlas' reply memorandum, this invoice was attached to Atlas' original memorandum as "Exhibit 4" and reflects only the work to be performed by D&D.
[2] La. Civ. Code art. 2521

The seller owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things.
[3] It is unclear as to the extent of Flash's knowledge "at the time of the sale."
[4] This appears to be at odds with the D&D invoice that Atlas attached to its original memorandum as "Exhibit 4." Said invoice does not state that D&D will clean the tubing only that it would inspect, test, and drift. Additionally, there is no evidence to corroborate the fact that D&D fulfilled the obligations it assumed.
[5] La. Civ. Code art. 2545

A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.
A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.
[6] La. Civ. Code art. 2520

The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.
A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.
[7] La. Civ. Code art. 2524

The thing sold must be reasonably fit for its ordinary use.
When the seller has reason to know the particular use the buyer intends for the thing, or the buyer's particular purpose for buying the thing, and that the buyer is relying on the seller's skill or judgment in selecting it, the thing sold must be fit for the buyer's intended use or for his particular purpose.
If the thing is not so fit, the buyer's rights are governed by the general rules of conventional obligations.
[8] La. Civ. Code art. 2529

When the thing the seller has delivered, though in itself free from redhibitory defects, is not of the kind or quality specified in the contract or represented by the seller, the rights of the buyer are governed by other rules of sale and conventional obligations.